UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| WILLIAM NELLUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:05-cv-0212-DFH-WGH |
| | ) | |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

From March 2003 until April 2005, plaintiff William Nellum worked for
defendant Ford Motor Company at the Evansville High Velocity Center ("HVC") as
a warehouse attendant.  In his two-year tenure at the Evansville HVC, Nellum was
disciplined repeatedly, a pattern that finally culminated in his termination.
Nellum sued Ford, contending that his discipline and termination were the result
of race discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and retaliation in violation of Title
VII.  Ford moved for summary judgment on all of Nellum's claims.  Nellum does
not contest Ford's motion as to his Section 1981 and Title VII race discrimination
claims, leaving only his Title VII retaliation claim.  Because Nellum has failed to
offer evidence sufficient to support his remaining claim, Ford's motion is granted.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). To prevail, then, the moving party must show that there is no genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party need not positively disprove the opponent's case; rather, it may prevail by establishing the lack of evidentiary support for that case. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Where the non-moving party bears the burden of proof on an issue at trial and the motion challenges that issue, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e)(2); see also *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999).

A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. See *id.* In deciding a motion for summary judgment, a court may not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence; the court must

-2-

view all the evidence in the record in the light reasonably most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party.  See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255.

*Facts for Summary Judgment*

In accordance with the standard for summary judgment motions, the facts below are either undisputed or reflect the evidence in the light most favorable to Nellum.  Facts adverse to Nellum that Ford has established beyond reasonable dispute are necessarily included.

I.    *The Ford Evansville HVC*

The Ford Evansville HVC, located in Evansville, Indiana, is a parts distribution center that ships automobile parts to independent Ford dealers. Nellum began working there as a warehouse attendant in March 2003.  As a warehouse attendant, Nellum was responsible for "pull[ing] parts to ship to dealers."  See Pl. Dep. 23.  From June 2003 to July 2004, Nellum's immediate supervisor was Monica Sutton.  Brad Stockoff stepped in as Nellum's supervisor in July 2004.  Sutton and Stockoff, in turn, were supervised by Mariano Alejandro "Alex" Rodriguez who was lead supervisor of the Evansville HVC from March 2003 until he was promoted to superintendent of the HVC in June 2004.  David Kappel was another supervisor at the Evansville HVC during Nellum's employment there. Neither Kappel nor Rodriguez directly supervised Nellum.

In the course of Nellum's employment, Robert Mabry and Bernese Harris worked as Midwest Regional Human Resources Manager and Human Resources Associate of the Evansville HVC, respectively.  As Human Resources Manager, Mabry was responsible for human resources at several Ford facilities, including the Evansville HVC.  Specifically, he was responsible for settling grievances, conducting investigations, and dealing with any personnel issues that arose, whether the personnel involved were hourly or salaried employees.  Harris was responsible for human resources matters only at the Evansville HVC.  She investigated harassment and discrimination complaints from Evansville HVC employees, including EEOC charges, complaints to the human resources department, and calls received by Ford's harassment hotline.

The Ford harassment hotline was available to Ford employees so that they were able to report confidentially incidents of discrimination or harassment. When an employee called the hotline, Ford headquarters contacted the facility at issue and reported the call.  The facility's human resources department was then responsible for investigating the call.  At the Evansville HVC, Harris was primarily responsible for investigating calls to the harassment hotline.

II.    *Nellum's Discipline Record and Complaint History*

Nellum worked at the Evansville HVC for about two years.  He was disciplined frequently.  Only slightly less frequently, Nellum complained about the

Evansville HVC and his treatment there.  Sometimes he complained formally (with EEOC charges) and sometimes informally (with harassment hotline calls).  The court examines the record year by year.

A.    *Nellum's 2003 Discipline and Complaint History*

Nellum began work at the Evansville HVC in March 2003.  On June 3, 2003, he received his first warning for following an employee to the women's restroom and opening the restroom door.  He received a second warning on June 13, 2003 for "disrespecting" his supervisors.  A month later, on July 14, 2003, Harris orally warned Nellum again because he became disruptive and upset about a job assignment.  Harris Aff. ¶¶14-16.

Three days after receiving discipline for that incident, Nellum made his first recorded call to the Ford harassment hotline.  He reported that he was being harassed by Rodriguez.  Def. Ex. X.  It is not apparent that Nellum provided any additional details as to how or why he believed he was being harassed, and he left an incorrect contact number.  Harris investigated Nellum's call by interviewing both Nellum and Rodriguez, and she responded by counseling Rodriguez regarding Ford's harassment policy.  Harris Aff. ¶¶ 60-61; Rodriguez Aff. ¶ 15.

All was quiet for nearly two months, but then on September 3, 2003, Nellum became angry and orally confronted a co-worker concerning the placement of

unspecified "cages" at the Evansville HVC.  As a result of this incident, Nellum was warned and suspended from the remainder of his shift plus an additional three days.  Pl. Dep. 131;  Harris Aff. ¶ 17.  On September 4, 2003, Nellum made his second call to the hotline, reporting that he had received discipline for violating Ford's "zero tolerance" policy while the other employee involved in the incident had not.  Def. Ex. Y.  Again, Harris investigated, concluding that Nellum had received discipline and the other employee had not because Nellum had been the instigator.  Harris Aff. ¶ 69.

A few days later, on September 7, 2003, Nellum called the hotline twice more.  In his first call, Nellum repeated his belief that the other employee involved in the cage placement incident had received inconsistent discipline.  Nellum stated that he had filed a grievance with his union and had spoken to an attorney.  He asserted that although he had complained to human resources and to supervisors, no one had done anything about his complaints, and that Ford had created a hostile work environment.  He also stated that he believed he had been discriminated against because Harris had not fully investigated the incident.  Def. Ex. Z.  In Nellum's second hotline call on September 7, he reported that earlier in the year he had helped a fellow employee move into a house.  Nellum was the only African-American present at the time.  Another co-worker who was also helping in the move put a sheet over his head and called out, "Hey, Will."  Def. Ex. Z.

Harris investigated Nellum's September 7 calls by interviewing Nellum and interviewing the employee who Nellum alleged had put the sheet over his head. Harris Aff. ¶ 67.  She learned that the incident had occurred in April 2003 and away from the workplace.   She concluded that several months had passed between the incident and Nellum's hotline call, and nothing comparable to the sheet incident had occurred since April 2003.   Harris Aff. ¶ 68.

Around this time, Harris referred Nellum for a fitness for duty evaluation because she believed his confrontations and behavior suggested a potential for physical violence.  Pl. Dep. 91-92; Harris Aff. ¶ 18.  The examining physician reported to Harris that Nellum did not display any symptoms or clinical indications of possible violent behavior, and he "should not be restricted from working based on the risk of workplace violence."  Pl. Ex. C.

The following month, on October 23, 2003, Harris issued an oral warning to Nellum because he was disruptive at the start of a meeting.  Harris Aff. ¶ 19. Then, Nellum failed to appear or report to work on November 15, 2003, and was counseled for this lapse two days later.  Harris Aff. ¶ 20.

B.    *Nellum's 2004 Discipline and Complaint History*

On January 15, 2004, Harris counseled Nellum for unsafe driving in the HVC parking lot, and the next day Nellum was given a warning and a week's

suspension for being disruptive and yelling.  Harris Aff. ¶¶ 21-22; Def. Ex. K.  In February 2004, Harris counseled Nellum a second time for unsafe driving and gave him a warning  when he crumpled up and threw error rate papers given to him by a supervisor.  Harris Aff. ¶¶ 23-24.  Then, on March 8 and 9, 2004, Nellum again failed to appear or report to work and Harris issued him yet another warning.  Harris Aff. ¶ 25; Def. Ex. L.

On March 26, 2004, Nellum asked supervisor David Kappel for union representation.  Kappel did not inform Nellum's union representative that he made such a request, and Nellum sought out his representative on his own.  Pl. Ex. L.  When Kappel later approached Nellum, Nellum asked that Kappel not speak to him but instead speak with his union representative.  Kappel feared that Nellum would hit him and described Nellum's behavior as a "violent outburst."  Kappel Aff. ¶ 9.  Nellum's co-worker witnessed the exchange and later reported to Harris her belief that Kappel had isolated Nellum and attempted to censor and antagonize him, and continued to approach Nellum as if to provoke or intimidate him.  Pl. Ex. L.  As a result of this incident, Nellum received a two week suspension for being disruptive, yelling at another employee, and behaving violently towards Kappel.  Harris Aff. ¶ 27; Def. Ex. M;  Kappel Aff. ¶¶ 9-10.

From May 6 to June 21, 2004, Nellum took medical leave for anxiety and stress.  On his return, he was not placed on any work restrictions.  Pl. Dep. 103-104, 211;  Harris Aff. ¶ 28.  On May 6, 2004, however, Nellum again had behaved

inappropriately in the workplace, and upon his return to work he was given a thirty day suspension for that behavior.  Def. Ex. N; Harris Aff. ¶ 29.

Nellum filed his first charge with the EEOC on June 29, 2004, alleging race and disability discrimination.  On July 16, 2004, he called the hotline, reporting that Harris had called his physician and Nellum wanted to know why.  In his call, Nellum stated that he had a problem temper but he felt he was not threatening.  Harris Aff. ¶ 71; Def. Ex. AA.  Harris responded to Nellum's call, asserting that she had not had any direct contact with Nellum's physician.  In her written response she commented that in spite of Ford's attempts to assist Nellum with anger management, Nellum had been disciplined on at least five occasions for inappropriate behavior, and several employees felt that Nellum's demeanor was very threatening.  Def. Ex. AA.  She also noted, "unfortunately, Mr. Nellum is now fabricating information."  *Id.*

On August 12, 2004, and again on September 2, 2004, Nellum called the hotline, claiming that he had been harassed by his supervisor Monica Sutton.  Def. Ex. BB; Def. Ex. CC.  In his August call, Nellum claimed that Sutton had harassed him by directing another employee to purposely place parts in an area that made Nellum's job more difficult.   Harris Aff. ¶ 73; Def. Ex. BB at 1.  Harris investigated Nellum's call and ultimately determined that Nellum had not been harassed.  Harris Aff. ¶¶ 75-76; Def. Ex. BB at 2-3.  In his September call, Nellum reported that Sutton had been giving him a hard time, had tricked him into

leaving work early, and was harassing him by calling other supervisors to check on Nellum's whereabouts.  Harris Aff. ¶ 79; Def. Ex. CC.

Again, Harris investigated.  Sutton sent an e-mail to Harris in response to Nellum's allegations, informing Harris that Nellum had not been tricked into going home early, but had requested to leave early because he was frustrated with another hourly employee.  Sutton Aff. ¶¶ 8-9; Harris Aff. ¶ 81; Def. Ex. DD at 2; Def. Ex. EE.  In fact, Nellum had left Sutton a voice mail message in which he thanked her for granting his request to leave early.  Sutton Aff. ¶ 9; Def. Ex. DD at 2; Def. Ex. EE.  Additionally, Sutton denied calling other supervisors regarding Nellum's whereabouts.  Harris Aff. ¶ 81; Def. Ex. DD at 2.  In her e-mail to Harris, Sutton stated:  "in my assessment of Mr. Nellum working for me for the past 16 months he has definitely gotten progressively worst [sic] in his behavior.  I have informed HR on several occasions how I feel about working around Mr. Nellum.  He is very unstable in both his thought process and behavior.  Please review his discipline history as well as how many times he has called the hotline (calling wolf)."  Def. Ex. EE.   Ultimately, Harris concluded that Nellum's September 2, 2004 call was groundless.  Harris Aff. ¶ 82; Def. Ex. DD at 2-3.

Nellum called the hotline again on September 7, 2004 to report that two employees had engaged in an oral confrontation and that one of the employees had been yelling, but neither employee received any discipline.  Harris Aff. ¶ 83; Def. Ex. FF.  When Nellum's call was investigated, Rodriguez, who had witnessed

-10-

the incident, reported that the two employees had been loudly "goofing around" and laughing, but the employees did not use "questionable" language.  Harris Aff. ¶ 85; Def. Ex. GG.  Nellum, in turn, was advised that context, not volume, was the important factor, and if he was offended by the statements of those employees he should submit a statement to human resources.  Harris Aff. ¶ 86; Def. Ex. GG at 2.  Nellum expressed his belief that nothing would come of such a complaint; he did not submit such a statement.  Def. Ex. GG at 2.

On October 7, 2004, Nellum called the hotline and complained that he had filed an EEOC charge and was being retaliated against by Harris, Rodriguez, and Kappel, stating that Harris, Rodriguez, and Kappel were watching Nellum and monitoring him heavily, and that Sutton was staring at him.  Mabry Aff. ¶ 32; Def. Ex. HH.  HVC human resources associate Harris was a target of the complaint, so regional human resources manager Mabry investigated this call.  He interviewed Nellum and the individuals Nellum identified.  Mabry Aff. ¶ 33.

Nellum told Mabry that he considered the issues to be closed.  Mabry Aff. ¶ 36; Def. Ex. HH at 3.  Sutton stated that she had neither stared at nor heavily monitored Nellum.  Mabry Aff. ¶ 34; Def. Ex. HH at 3.  Harris informed Mabry that on October 6, 2007, Nellum had a loud outburst.  Nellum had requested to speak with Rodriguez, but Harris accompanied Rodriguez into the room.  They attempted to speak to Nellum, but Nellum refused to talk to Rodriguez with Harris present and left the room.  Mabry Aff. ¶ 35; Harris Aff. ¶ 88; Def. Ex. HH at 2.  Mabry

determined that Nellum had not been heavily monitored and had not been retaliated against. Mabry Aff. ¶ 37; Def. Ex. HH at 2-3.

On November 24, 2004, Nellum phoned the hotline to report that Kappel and Stockoff denied him union representation regarding a workplace injury. Harris Aff. ¶ 93; Def. Ex. KK.  Harris investigated once again, taking statements from Nellum, Kappel, and Stockoff.  Harris Aff. ¶ 95; Def. Ex. LL.  Indeed, Nellum had requested to speak to a particular union representative, but when he was told that the individual he requested was unavailable, Nellum refused to speak to the representative who was available.  Def. Ex. LL at 1.  Harris determined that Nellum had not been denied union representation.  Harris Aff. ¶ 99.

While Harris' investigation of Nellum's November 24 call was ongoing, Harris orally warned Nellum for being disruptive at the worksite. Harris Aff. ¶ 31.  Then, on December 2, 2004, Nellum was absent from work without permission.  He received a warning for that absence. Harris Aff. ¶ 35; Def. Ex. O.  On December 3, 2004, Nellum yelled at a supervisor and then continued behaving inappropriately in the presence of security personnel.  Pl. Dep. 203; Harris Aff. ¶¶ 36-37; Def. Ex. P.

On December 6, 2004, Harris met with Nellum to investigate his November 24 hotline call and to discuss his behavior on December 3.  Pl. Ex. A.  Nellum told Harris that he had promised himself that if he received another write-up for

inappropriate behavior, he would "come in here and 'shoot your wad.'"  Pl. Ex. A.

Harris asked Nellum to explain what he meant by the word "shoot."  Pl. Ex. A.

Nellum explained that he was not planning on shooting people, that he would

never shoot anybody.  Pl. Ex. A.  Explaining further, Nellum told Harris that he

meant that "if I get written up again for inappropriate behavior, I'm going come in

here and tell everybody that I've been holding things back from off.  I'm going to

say everything that I ever wanted to say, so that I can feel better, and then I'm

going to walk out of the building with my collar up."  Pl. Ex. A.  Nellum was

suspended for thirty days for his December 3 outburst against the supervisor and

the security guard, but was not disciplined for the "shoot your wad" comment.  Pl.

Ex. A; Harris Aff. ¶ 36; Def. Ex. P.

     While suspended, Nellum filed two additional charges with the EEOC,

alleging retaliation in the first, filed on Decemer 14, 2004, and race discrimination

in the second, filed on December 20, 2004.

     C.    *Nellum's 2005 Discipline and Complaint History*

     Nellum returned to work on January 12, 2005.  On his first day back, he

was disruptive toward a supervisor and the HVC superintendent, receiving

another warning.  Harris Aff. ¶ 38;  Rodriguez Aff. ¶ 11.

Nellum took medical leave from January 18, 2005 until February 18, 2005. Harris Aff. ¶ 39.  While Nellum was on medical leave, Mabry was informed that Nellum called the harassment hotline five times to complain about Harris.  Mabry Aff. ¶ 38;  Def. Ex. MM.  In a February 9 call, Nellum stated that he was being harassed by Harris and that he hoped to resolve the situation before he quit the company.  On February 18 he stated that he was not a threat and there was nothing wrong with him.  In a February 24 call, Nellum reported that he had made numerous calls to the hotline and had filed EEOC charges, stated that he was being harassed by Harris and "bird-dogged," and expressed that there was nothing wrong with him.  Def. Ex. MM;  Mabry  Aff. ¶ 39.  Nellum also called the hotline to complain that a union committee person left the plant floor without supervisor permission.  Mabry Aff. ¶ 39.  Mabry investigated these calls and determined that they were unfounded.  Mabry Aff. ¶¶ 40, 43.

On March 8, 2005, Harris received reports that Nellum was disrespectful to a security guard and then had an encounter with a contracted traffic employee. Harris Aff. ¶¶ 40-41.  Harris also learned that on March 8, 2005, Nellum became upset with Rodriguez and physically charged towards him.  Harris Aff. ¶ 42; Mabry Aff. ¶ 9; Rodriguez Aff. ¶¶ 12, 14; Def. Ex. Q; Def. Ex. R.  Mabry, Harris, and Elijah Jones investigated the incident. Harris Aff. ¶ 44; Mabry Aff. ¶ 11; Rodriguez Aff. ¶¶ 12-13.   Nellum was suspended pending the outcome of their investigation.  Harris Aff. ¶ 43; Mabry Aff. ¶ 10.  When he was asked about this incident, Nellum stated that he had asked for Rodriguez to contact Nellum's union representative but Rodriguez had refused, telling Nellum to ask his supervisor.

-14-

Def. Ex. S.  Rodriguez shouted, "am I supposed to drop everything I'm doing, just to do something for you?"  Def. Ex. S.  Nellum admitted that he moved toward Rodriguez, but believed he was at least 20 feet away from him at all times and did not become loud or raise his voice.  Def. Ex. S.  Nellum admitted that a co-worker had grabbed him to stop him from going towards Rodriguez.  Def. Ex. S.  He believed that Rodriguez had been rude and was retaliating against him for a question Nellum had asked at the start-up meeting.  Def. Ex. S.  Nellum's version of the events was corroborated by at least one witness, who believed that the incident discouraged Nellum, but that Nellum would not have hurt anyone.  Pl. Ex. B.

While the investigation was pending, Nellum made two more calls to the hotline, on March 22 and March 23, 2005.  Def. Ex. NN; Def. Ex. OO.  In those calls, he reiterated the April 2003 sheet incident and stated that he had filed an EEOC charge and then began receiving time off for bad language.  He admitted in the call that his language was bad.  He also reported that he had received a two week suspension for walking toward Rodriguez, but no one told him what the charge was.  Def. Ex. NN; Def. Ex. OO.  He complained that Harris was treating him unfairly, that Stockoff was following him around the break areas, and that Rodriguez was speaking to him in a demeaning fashion.  Def. Ex. OO.

Upon the conclusion of his investigation into Nellum's March 8 outburst, Mabry believed that Nellum had acted in a threatening manner toward Rodriguez.

After holding a final meeting with Nellum, Mabry decided to terminate Nellum's employment.  Mabry based his decision on the March 8, 2005 incident and Nellum's prior discipline history, including his history of inappropriate and disrespectful behavior and his violent tendencies.  Mabry Aff. ¶¶ 13-15.  Nellum's employment with Ford was terminated on April 2, 2005.

III.    *Discipline History of Nellum's Co-Workers*

Nellum has come forward with evidence that other employees at the Evansville HVC were disciplined for infractions similar to Nellum's.  Like Nellum, Jesus Sabater worked as a warehouse attendant at the Evansville HVC.  Sabater was disciplined three times:  he received written discipline in August 2003 for inappropriate behavior, written discipline in October 2004 for making an inappropriate statement regarding race in the presence of other employees, and discipline in March 2005 for arguing with another employee on the plant floor. Pl. Ex. E.  Sabater was neither suspended nor terminated as a result of these incidents, and he is not known to have made any complaints of illegal discrimination or other activity at the Evansville HVC.

Eddie Williams, too, was a warehouse attendant.  In June 2003, Williams raised his voice to Kappel and said, "you don't have to come up to me with your ass around your shoulders."  Williams was permitted to return to work the day after making that statement.  In October 2004, Williams received a one day

suspension for arguing with another employee and using profanity.  In December 2004, Williams was suspended for three days for using inappropriate language in the workplace.  He received a warning for speeding out of the HVC parking lot in March 2005, and he received a three day suspension in May 2005 for yelling at a contracted employee.  Pl. Ex. I.  Williams did not receive more than a three day suspension for any of these infractions, and he is not known to have ever complained regarding his employment at the Evansville HVC.

Larry Carnell is also a warehouse attendant who was disciplined during his employment at the Evansville HVC.  In December 2003, Carnell yelled at Kappel, using profanity, and he was counseled for this behavior.  A year later, in December 2004, Carnell was warned for failing to behave respectfully and work together with his co-workers, and was sent home for the duration of his shift.  Then, in April 2005, Carnell yelled at Rodriguez and Sutton, threatening to file charges against them and to call the police because Sutton had touched his radio.  Carnell was not disciplined for this incident.  Pl. Ex. J.  Carnell has not complained regarding his employment at the Evansville HVC.

Paul Downs, also a warehouse attendant, had an altercation with Rodriguez, Mabry, and Harris in October 2004.  He approached Rodriguez in a threatening manner, using profanity, and Harris stepped in between them because it appeared as though Downs would assault Rodriguez.  Pl. Ex. K.  Downs walked down the hall, threatening other employees, and then went after Rodriguez a second time.

Downs received a one week suspension for this incident.  Downs has never brought a complaint regarding his employment at the Evansville HVC.  Additional facts are stated below as needed, keeping in mind the standard for summary judgment.

*Discussion*

I.      *The Direct Method of Proof*

Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . .  because he has opposed any practice made an unlawful employment practice" by Title VII.  42 U.S.C. § 2000e-3(a).  A plaintiff may prove this type of employment discrimination, commonly known as "retaliation," through either the direct or indirect methods of proof.  See *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662  (7th Cir. 2006); *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005).  Nellum attempts to withstand Ford's summary judgment motion only under the direct method of proof.

Under the direct method, a plaintiff must show that "(1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action taken by the employer; and (3) [there was] a causal connection between the two." *Tomanovich*, 457 F.3d at 663;  *Moser*, 406 F.3d at 903; see also *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, —, 126 S. Ct. 2405, 2409 (2006). The direct method carries an inherent requirement that the plaintiff show that the

decision maker had actual knowledge of the plaintiff's protected activity.  See *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (explaining if a decision maker was unaware of the plaintiff's protected activity, the adverse employment action could not have been caused by it).

### A.     *Nellum's Protected Activity*

To succeed, then, Nellum must first show that he engaged in protected activity.  There is no question that Nellum's three EEOC charges filed in the course of his employment (on June 29, 2004, December 14, 2004, and December 20, 2004, respectively) constitute protected activity.  See *Tomanovich*, 457 F.3d at 663; *Ajayi v. Aramark Bus. Serv., Inc.*, 336 F.3d 520, 533 (7th Cir. 2003) (noting that plaintiff satisfied the first element of her prima facie case by filing her EEOC charge).

Nellum also contends that his numerous calls to the Ford harassment hotline were protected activity.  To the extent that he complained of illegal activity in those calls, he is correct.  See *Hamner v. St. Vincent Hosp. and Health Care Center, Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000) (to be protected activity, plaintiff must have a sincere and reasonable belief that he is opposing an unlawful practice).  However, an employee's general complaints of discrimination or harassment are not sufficient without either indicating a connection to a class protected by Title VII or at least providing facts sufficient to create an inference of

such a connection.  See *Tomanovich,* 457 F.3d at 663-64; *Sitar v. Indiana Dep't of Transportation,* 344 F.3d 720, 727 (7th Cir. 2003) (plaintiff's complaint "did not invoke any action protected by Title VII" and thus was not protected activity); *Miller v. Family Mut. Ins.,* 203 F.3d 997, 1008 (7th Cir. 2000) (plaintiff did not engage in protected activity where she complained generally that she was paid less than her co-workers but did not complain of discrimination related to a class protected by federal law).

Nellum argues that each of his calls to the harassment hotline was protected activity.  Pl. Br. at 12.  However, Nellum has not brought forward evidence sufficient to show that was the case for each of his many calls.  Details of those calls available in the record include the following:

- When he called the hotline on July 17, 2003, he complained only that he was being "harassed" by Rodriguez.

- On September 4, 2003, Nellum complained that he was disciplined but a co-worker was not in the same incident.

- In the first of Nellum's September 7, 2003 calls, he again stated that he believed he had received disparate discipline, saying that he had filed a grievance with his union and had contacted an attorney. Additionally, he stated that Ford's failure to resolve the situation created a "hostile work environment," and Harris' failure to conduct a full investigation was discrimination.

- When Nellum called the hotline on July 16, 2004, he stated that Harris was calling his doctor and Nellum wanted to know why. Nellum admitted that he had a temper problem but stated that he felt he is never threatening.

- In his August 12, 2004 call, Nellum complained that he was being harassed by Sutton.  Specifically, he complained that Sutton

purposely had a pallet of parts placed opposite where they should have been placed, and this placement made Nellum's job harder.

- On September 2, 2004, Nellum called the hotline and reported that he was having issues with Sutton, and that he was sick and tired of being harassed and of the injustice he was receiving from management staff. Nellum stated that he had been tricked into going home early from his shift on September 1, and Sutton was calling others to check on his whereabouts.

- On September 7, 2004, Nellum reported that he witnessed two employees in an argument, and one of the employees was yelling loudly.  He stated that he brought the situation to Rodriguez's attention, pointing out to Rodriguez that Nellum had once received a 30 day suspension for a lesser infraction.  He complained that he did not know why the rules were applied differently to different people.

- On November 24, 2004, Nellum reported that Kappel and Stockoff denied his request for union representation.

- On February 9, 2005, Nellum stated that he was being harassed by Harris.

- On February 18, 2005, Nellum stated that he was not a threat and that there was nothing wrong with him.

- In February 2005, Nellum complained that a union committee person left the plant floor without supervisor permission.

- On March 23, 2005, Nellum complained that Harris was treating him unfairly, that Stockoff was following him around the break areas, and that Rodriguez was speaking to him in a demeaning fashion.

Not every workplace complaint is protected, and these calls do not cross over into the territory of protected activity.  Although Nellum sometimes used loaded words such as "harassment" and "hostile work environment" and accused Ford of treating him differently than his co-workers, he never stated that he believed he was being treated disparately *because* of his race or his protected activity, nor did he provide sufficient information for Ford to draw that inference.  See, *e.g.*, *Sitar*,

344 F.3d at 727 (in gender discrimination context, "although an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, 'she has to at least say something to indicate her [gender] is an issue'") quoting *Miller*, 203 F.3d at 1008.

Some of Nellum's other calls to the hotline at least gave Ford sufficient information to draw an inference that Nellum believed he was suffering disparate treatment because of his protected status. In Nellum's second call on September 7, 2003, he raised race as a possible issue. Def. Ex. Z; Pl. Br. at 12. Nellum alleged that while he was helping a co-worker move, another co-worker put a sheet over his head and called, "Hey Will." Def. Ex. Z. Nellum reported that he was the only African-American individual in the group, and he alleged that because his co-worker had asked him to help in the move, his action constituted work-related harassment. Def. Ex. Z.[1] Because a reasonable jury could find that Nellum intended to raise a complaint of illegal race discrimination by his description of this incident (particularly by including the detail that he was the only African-American

---

[1]In his response brief, Nellum states he complained about the sheet incident in his July 16, 2004 call, but does not recount that he complained of the incident in his second September 7, 2003 call. Pl. Br. 12. The documents support an inference that Nellum reported the sheet incident to Ford on September 7, 2003, and that Ford provided the incident as background to its internal investigation of Nellum's July 16, 2004 call. In that document, Ford noted that Nellum had alleged that his "supervisor put a sheet over his head in the facility – nothing has happened." Def. Ex. Z and AA. Therefore, the court assumes that Nellum complained of the sheet incident on September 7, 2003, and that Nellum cited the incorrect exhibit in his description of the September 7, 2003 and July 16, 2004 hotline calls.

present at the time), the court finds that Nellum's second September 7, 2003 call could have amounted to protected activity.

On October 7, 2004, February 24, 2005, and again on March 22, 2005, Nellum called the hotline to report that he was being harassed and retaliated against after filing EEOC charges.  Def. Ex. HH, MM, NN.  In his October 2004 call, Nellum stated that after he had filed an EEOC charge, Harris, Rodriguez, and Kappell watched him constantly and monitored him heavily, and that Sutton had stared at him for fifteen minutes.  Def. Ex. HH.  In February 2005, Nellum reiterated his belief that he was being harassed by Harris, mentioning in the call that Nellum had brought charges before the EEOC.  Def. Ex. MM.  His March call echoed these complaints.  Def. Ex. NN.  Although the connection Nellum drew between his EEOC charges and the mistreatment he believed he received was weak at best, the court assumes that Nellum at least provided sufficient information so that, upon receiving these calls, Ford could have drawn an inference of the existence of a charge of illegal activity.

B.    *Materially Adverse Action*s

Under the standard established by the Supreme Court in *Burlington Northern*, to establish his retaliation case Nellum must show that he suffered a "materially adverse action."  See *Burlington Northern*, 548 U.S. at —, 126 S. Ct. at 2409.  In the retaliation context, materially adverse actions are no longer limited

to employment-related actions (hiring, termination, suspension) but can include any actions that would dissuade a reasonable employee from exercising his or her rights.  See *id.*  Nellum's termination and his December 2004 suspension both were materially adverse actions.[2]

C.     *Ford's Knowledge of Nellum's Protected Activity*

To show a causal link between his protected activity and his thirty day suspension in December 2004 or his termination in April 2005, Nellum must show that the decision maker knew of his protected activity.  See *Tomanovich,* 457 F.3d at 668-69; *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 665 (7th Cir. 2005); *Luckie*, 389 F.3d at 715.  Ford contends that the Evansville HVC supervisors (Rodriguez, Sutton, and Kappel) did not know that Nellum had engaged in protected activity.  Def. Br. at 33-34.  Without such knowledge, Ford argues, it was impossible for those individuals to retaliate against Nellum.[3]

---

[2]Nellum was suspended on four other occasions:  he received a three day suspension on September 3, 2003, a one week suspension on January 14, 2004, a two week suspension on March 26, 2004, and a 30 day suspension on June 24, 2004.  However, because these suspensions were outside the 300 day window of his April 8, 2005 EEOC charge, they will not be analyzed here.  See 42 U.S.C. § 2000e-5(e)(1) (a charge must be filed with the EEOC 300 days "after the alleged unlawful employment practice occurred" or the employee may not challenge the event in court).

[3]Nellum responded to Ford's assertion that neither Rodriguez, Sutton, nor Kappel had knowledge of Nellum's EEOC charges by presenting sufficient evidence to indicate that Rodriguez, at least, had knowledge of Nellum's June, 24, 2004 EEOC charge as of October 7, 2004.  Pl. Br. at 4.  Nellum called the hotline in October 2004 and complained that he was being retaliated against by Harris, Rodriguez, and Kappel after filing an EEOC charge.  Def. Ex. HH.  Harris
(continued...)

To analyze this issue it would be helpful to know, of course, who the decision makers were. Ford and Nellum agree that Nellum received a thirty day suspension in December 2004, but the parties fail to disclose who made that decision. Pl. Br. 14; Def. Br. 8. It appears that Harris signed the document in support of the suspension. Def. Ex. P. In addition, Harris wrote an e-mail reciting the events leading to Nellum's December 2004 suspension, thus implying that she decided to suspend Nellum. Pl. Ex. A. As the HVC human resources associate, Harris was responsible for investigating and responding to informal workplace discrimination and harassment complaints, including calls to the harassment hotline and EEOC charges. Harris Aff. ¶ 5; Mabry Aff. ¶¶ 4-5. The court must view all the evidence in the record in the light most favorable to Nellum, as the non-moving party. Harris had knowledge of Nellum's protected activity, so the court assumes that Ford had knowledge of Nellum's protected activity when Nellum was suspended.

There is no dispute on this point concerning Nellum's termination. Ford contends that Nellum's employment was terminated by Mabry, and Nellum does

---

[3](...continued)
investigated, and in her investigation report states that Rodriguez told her that "as far as Mr. Nellum submitting an EEOC complaint this is the first time that I have been informed about any complaint involving the EEOC." Def. Ex. II at 3. In support of its motion for summary judgment, Ford submitted an affidavit from Rodriguez, signed on February 15, 2007, in which he stated, "during Mr. Nellum's employment with the Evansville HVC, I never knew that Mr. Nellum had filed any Charges of Discrimination with the EEOC." Rodriguez Aff. ¶21. Although Rodriguez' affidavit is at best contradictory and at worst disingenuous, it is not necessary to delve into this discrepancy. As no evidence has been presented that Rodriguez was a decision maker either in Nellum's December 2004 suspension or in his termination, the question of what he might have known when is moot for purposes of summary judgment.

not dispute this assertion.    Mabry (along with Harris) was responsible for investigating and responding to informal workplace discrimination and harassment complaints, including calls to the harassment hotline as well was EEOC charges. Harris Aff. ¶ 5; Mabry Aff ¶ 4.  Either Mabry or Harris investigated each of Nellum's calls to the harassment hotline.  Harris Aff. ¶ 99.  From these facts, a reasonable jury could find that Mabry, as the decision maker in Nellum's termination, had knowledge of Nellum's protected activity.


D.    *Causation Under The Direct Evidence "Mosaic"*

Nellum has demonstrated that he engaged in protected activity and that he suffered materially adverse employment actions.    For his retaliation claim to succeed under the direct method of proof he must also come forward with evidence of a causal link between the two.  While truly direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus, a plaintiff can also prevail by assembling what is known as a "convincing mosaic" of circumstantial evidence indicating that a defendant acted with a discriminatory motive. See *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)*; Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir.1994).


The Seventh Circuit has recognized three types of circumstantial evidence that can create this mosaic of proof either individually or in combination.  See generally *Troupe,* 20 F.3d at 736.  Most commonly, plaintiffs will bring direct

evidence by way of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.*, citing *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 426 (7th Cir.1992); *Holland v. Jefferson National Life Ins. Co.*, 883 F.2d 1307, 1314-15 (7th Cir.1989). Second, plaintiffs can survive summary judgment using direct evidence by demonstrating that similarly situated employees who were not in the plaintiff's protected class received systematically better treatment in the workplace. This showing need not be rigorously statistical. See *Troupe*, 20 F.3d at 736. Third, a plaintiff might show that he or she was qualified for the job but was passed over for or replaced by a similarly situated person not in the protected class, and that the employer's stated reason for the difference in treatment is pretextual. *Id.* at 736. Regardless of the category of evidence brought forward by a plaintiff and whether or not the evidence is circumstantial, to withstand a motion for summary judgment the evidence brought forward must point directly to a discriminatory reason for the employer's action. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); see also *Troupe*, 20 F.3d at 737 (circumstantial evidence must allow a rational trier of fact to infer that defendant had fired plaintiff because the latter was a member of a protected class). Here, Nellum attempts to survive summary judgment by bringing forward evidence in the first and second categories of the three possible types: suspicious timing and ambiguous statements, and similarly situated co-workers.

1.      *Suspicious Timing and Ambiguous Statements*

Nellum argues that Ford's retaliatory motive is evidenced by the suspicious timing of the events leading to and culminating in his December 2004 suspension and his April 2005 termination.   However, without additional evidence of causation, suspicious timing can almost never satisfy the causation prong of a plaintiff's burden on summary judgment in a retaliation case.   See *Squibb v. Memorial Medical Center*, 497 F.3d 775, 787 (7th Cir. 2007);   *Burks v. Wisconsin Dep't of Transportation*, 464 F.3d 744, 758 (7th Cir. 2006); *Scaife v. Cook County*, 446 F.3d 735, 742 (7th Cir. 2006); *Lang v. Illinois Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ("close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link").   As the Seventh Circuit noted in a recent unpublished order, to hold otherwise would have the unintended consequence of offering nearly absolute protection (or at least a jury trial) to any employees keen enough to threaten a lawsuit when they believe they are about to be fired.   See *Reed v. Innovative Health & Fitness Ltd.*, 2008 WL 110978, at *2 (7th Cir. Jan. 10, 2008) ("a plaintiff cannot guarantee himself a prima facie case simply by threatening a lawsuit when it appears he is about to be fired"), citing *Squibb*, 497 F.3d at 787, and *Burks*, 464 F.3d at 758.   Because Nellum does not present one of those rare cases where suspicious timing alone is enough to satisfy his burden, he must present additional evidence sufficient to convince a reasonable jury of causation.

Nellum points to Sutton's comment, found in an internal investigation e-mail, that, after Nellum's September 2, 2004 call to the hotline – his seventh of what would be seventeen calls in all – she believed he was "calling wolf." Pl. Br. 16; Def. Ex. EE.   Nellum contends that Sutton's statement was ambiguous and constitutes circumstantial evidence of a causal connection.  The court disagrees. Sutton's comment does not support an inference of a causal connection between Nellum's September 2004 hotline call and his December 2004 suspension or April 2005 termination.  First, Sutton ceased directly supervising Nellum in July 2004. There is no evidence that Sutton was involved in the decisions to suspend or to terminate Nellum.  Nellum has not produced any evidence to suggest that Sutton's comment was anything other than a so-called "stray remark" – a comment that was neither proximate to nor related to the employment decision.  See *Nichols v. Southern Illinois University-Edwardsville*, 2007 WL 4553649, at *7 (7th Cir. Dec. 28, 2007).   Even assuming that Sutton was meaningfully involved in Nellum's suspension or termination, her isolated comment was well removed in time from the materially adverse actions he suffered and would not support an inference that Sutton harbored a retaliatory animus.   The remark is insufficient to defeat summary judgment, and Nellum has failed to demonstrate causation under the first of his possible routes to proving his case with direct evidence.

2.    *Similarly Situated Employees*

Nellum also contends that his claims should survive summary judgment because other employees who were similarly situated to him but had not engaged in protected activity were treated more favorably than he was.  A similarly-situated employee is one who was performing at a comparable level, had similar qualifications, and conducted himself similarly to Nellum.  See *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).  As the Seventh Circuit explained in *Radue*, "this normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct." *Id.* at 617-18.   This component of a court's analysis "is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees – distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions."  *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).   Under this standard, the court must ask "whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation." *Humphries*, 474 F.3d at 405.

Nellum argues that the following individuals were similarly situated to him but received more favorable treatment:   Jesus Sabater, Eddie Williams, Larry

Carnell, and Paul Downs.[4]  Pl. Br. at 17-20.  Ford admitted that these employees were accused of or investigated for conduct similar to the conduct that led to Nellum's termination.  Pl. Ex. D.  The court's inquiry, then, is to determine whether these employees' workplace behavior and discipline history might allow a jury to infer retaliation.  Even granting as much flexibility in favor of Nellum as reasonably possible, Nellum has not satisfied this burden.

Ford contends that Williams and Carnell were not similarly situated to Nellum because they were supervised by Kappel and not by Sutton or Stockoff, as Nellum was.  Def. Reply 13.  Ford does not indicate who supervised Sabater or Downs during the relative time period, but there is no need for the court to search the record for this information.  Mabry was the decision maker in Nellum's termination, and Mabry was the human resources manager overseeing the Evansville HVC.  The court does not know for certain who decided to suspend Nellum in December 2004 but, as it did on the issue of Ford's knowledge of Nellum's protected activity, the court gives the benefit of the doubt to Nellum: Harris was the human resources associate overseeing the Evansville HVC.

---

[4]In his response to Ford's motion for summary judgment, Nellum states that Ford produced the personnel files of other employees, including Michael Moore, Kevin Patrick, Sharon Thompson, "as well as others," and implies that these individuals could be comparators, also.  Pl. Br. 16.  In the fact section of his response, he included information regarding behavioral infractions committed by Michael Moore, Kevin Patrick, and Sharon Thompson.  However Nellum made no further effort to establish these individuals as similarly-situated, and the court is not obliged to develop any argument concerning these named and unnamed individuals on Nellum's behalf.  The court considers such an argument to be forfeited.

Presumably, in these positions, either Mabry or Harris would have been involved in any discipline Nellum, Sabater, Williams, Carnell or Downs received (or did not receive). In this case it is appropriate to conduct the similarly situated analysis in view of who the decision maker was, rather than who the immediate supervisor was. See, *e.g., Henderson v. OS Restaurant Service Inc.,* 2008 WL 216581, at *7 (S.D. Ind. Jan. 24, 2008). The court will not discount the similarity of Williams or Carnell on this basis.

Even though these individuals fell under a common decision maker, this similarity cannot overcome the essential and, for Nellum, insurmountable difference between them. The undisputed facts show that none of these individuals had a discipline record or history of bad behavior that remotely approached Nellum's in terms of either frequency or severity. Sabater committed three infractions, Williams five, Carnell three, and Downs one. For the most part, they were disciplined for those infractions. Nellum describes their collective discipline histories as "extensive," Pl. Br. 17, but compared to Nellum's own record of rule violations and behavioral incidents, the court is not persuaded. In the course of Nellum's tenure at the Evansville HVC, Nellum was disciplined at least eighteen times for poor performance and behavior ranging from failing to appear at work to yelling at and behaving in a potentially threatening manner towards his co-workers and supervisors. It was entirely appropriate for Ford to take the entire performance history and context into account when doling out discipline, so long as it did so without retaliating on the basis of protected complaints about perceived

-32-

unlawful discrimination.  Nellum has failed to raise any evidence that Ford treated him less favorably than it did any other employee who had not engaged in protected activity.  Nellum has not met his burden of proving causation using direct evidence, and his retaliation claim fails accordingly.

<em>Conclusion</em>

For the foregoing reasons, Ford's motion for summary judgment is granted in its entirety.  The court will enter final judgment accordingly.

Date:  February 1, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Charlie J. Harris Jr.
BERKOWITZ OLIVER WILLIAMS SHAW & EISENBRANDT, LLP
charris@bowse-law.com

Julia D. Kitsmiller
BERKOWITZ OLIVER WILLIAMS SHAW & EISENBRANDT LLP
jkitsmiller@bowse-law.com

Denise K. LaRue
HASKIN LAUTER  & LARUE
dlarue@hlllaw.com

Timothy S. Millman
BERKOWITZ OLIVER WILLIAMS SHAW & EISENBRANDT LLP
tmillman@bowse-law.com

Patrick A. Shoulders
ZIEMER STAYMAN WEITZEL & SHOULDERS
pshoulders@zsws.com